IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

DARRELL W. CHUCULATE, )
)
Plaintiff, )
)
v. ) Case No. CIV-09-381-KEW
)
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security Administration, )
)
Defendant. )

**OPINION AND ORDER**

Plaintiff Darrell W. Chuculate (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the finding of this Court that the Commissioner's decision should be and is REVERSED and REMANDED for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ."

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally*, Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see also, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on February 13, 1957 and was 52 years old at the time of the ALJ's decision. Claimant completed his high school education as well as one year of college. Claimant worked in the past as a nursery worker, a dress maker, a brick maker, a shopping

cart assembler, a roofer's helper, and a flagger. Claimant alleges an inability to work beginning November 23, 2005, due to problems using his hands after he underwent surgeries to repair fractures in his right wrist and left elbow. Claimant also contends he experiences problems with carpel tunnel syndrome in his right wrist, sleep problems related to pain in his elbow, right hand, and right wrist, hypertension, diabetes, dizziness, vision difficulties, and feet problems related to his diabetes.

## Procedural History

On December 8, 2005, Claimant protectively filed for disability insurance benefits under Title II (42 U.S.C. § 401, *et seq.*) and supplemental security income pursuant to Title XVI (42 U.S.C. § 1381, *et seq.*) of the Social Security Act. Claimant's applications were denied initially and upon reconsideration. On January 5, 2009, an administrative hearing was held before ALJ Lantz McClain in Tulsa, Oklahoma. On March 23, 2009, the ALJ issued a partially favorable decision on Claimant's applications, finding him disabled for the closed period beginning November 23, 2005 and ending on August 14, 2007. On September 8, 2009, the Appeals Council denied review of the ALJ's decision. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981,

4

416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step four and five of the sequential evaluation. He determined that Claimant was disabled for the closed period. However, after this period, Claimant made medical improvement such that retained the residual functional capacity ("RFC") to perform his past relevant work as a flagger for the highway department and as a shopping cart assembler. The ALJ also determined Claimant retained the RFC to perform a full range of light work with some limitations.

## Errors Alleged for Review

Claimant asserts the ALJ committed error in failing to apply the correct legal standard regarding medical improvement and the decision that Claimant had reached medical improvement was not supported by substantial evidence. Alternatively, Claimant contends the ALJ (1) improperly rejected the opinion of Claimant's treating physician without re-contacting him for clarification; and (2) found Claimant retained the RFC to perform light work without the support of substantial evidence.

## Assessment of Medical Improvement

Claimant's primary impairment arose after he fell from a roof and sought treatment on November 23, 2005. X-rays of Claimant's

left elbow revealed an acute comminuted fracture through the articular surfaces of the olecranon with approximately 10 mm of diastasis. (Tr. 301). Claimant also suffered a greatly comminuted fracture involving the distal most aspect of the radius with fracture fragments extending through the articular surface of the distal radius. (Tr. 302).

Claimant was treated by Dr. Guy Grooms. On November 24, 2005, Dr. Grooms performed an open reduction and internal fixation procedure on Claimant's right wrist with a volar locking plate, while also applying an external fixator. Dr. Grooms also performed an open reduction and internal fixation surgery on the olecranon fracture in Claimant's left elbow. (Tr. 342-43).

On December 9, 2005, Dr. Grooms found Claimant had good motion in his small and ring finger and thumb but his index and long finger were "quite stiff" and more than 3cms away from touching the palms on both fingers. His elbow was doing better with 30 degrees of extension and flex to 115 degrees. Dr. Grooms noted some gap formation in the sagittal plane through the distal radius and that it was "severely comminuted." (Tr. 282).

On December 21, 2005, Dr. Grooms found Claimant could bring his long, ring, and small finger down and touch his palm. The index finger had about 2 cms to go. Light touch sensation was

somewhat diminished on the right side. (Tr. 279). From this visit, Dr. Grooms signed a note indicating Claimant could not work for at least another 2 months. (Tr. 281).

On January 4, 2006, Dr. Grooms removed the external fixator from Claimant's right wrist. Claimant's fingers were moving better but the elbow still lacked 15 degrees of extension and could flex to 130 degrees and near pronation and supination. (Tr. 277).

On January 25, 2006, Dr. Grooms found Claimant still could not touch his index finger to his palm and his grip strength was "quite weak." X-rays of Claimant's right wrist revealed an easily visible radiolucent area that is longitudinal through the distal radius. (Tr. 275).

On February 28, 2006, Claimant continued with physical therapy. The therapist found Claimant had left wrist extension of 75 degrees and right wrist extension of 10 to 15 degrees. (Tr. 417). Claimant demonstrated grip strength of 70 pounds with his left hand and 30 pounds with his right hand. (Tr. 416).

On March 1, 2006, Claimant was again attended by Dr. Grooms. Dr. Grooms indicated Claimant continued to experience numbness in his thumb, index, and long finger. He exhibited no thenar atrophy. Claimant had moderately good grip strength and good pinch strength. He had negative Tinel's at the wrist. Wrist motion was still about

7

50% of normal. Claimant had better pronation and supination. His elbow had normal flexion but still lacked about 5 degrees of full extension, with full pronation and supination. Dr. Grooms diagnosed Claimant with right carpal tunnel syndrome. (Tr. 272).

On March 11, 2006, Claimant underwent a consultative physical examination by Dr. Caryn Roelofs. Dr. Roelofs found Claimant had reduced right wrist and left elbow pain and stiffness with numbness in his right first three fingers which "limits his ability to do a lot of activities that involve using the hands and arms a lot, especially when a lot of force is required." Dr. Roelofs opined that Claimant needed to have an EMG of his right upper extremity to help evaluate the numbness in his hand. (Tr. 446). Dr. Roelofs found Claimant's right wrist hinge palmar and dorsal range of motion was decreased to 40 degrees. Claimant's right wrist radial range of motion was reduced by 10 degrees and left elbow extension was about 10 degrees less than normal. (Tr. 449).

On October 24, 2006, Claimant underwent a consultative physical examination by Dr. Mohammed Quadeer. Dr. Quadeer found Claimant's left elbow extension was limited up to 10 degrees, his right wrist rotation in supination was significantly decreased at 40 degrees when 80 degrees is normal. Claimant's right wrist hinge palmar and dorsal range of motion was decreased by 20 degrees.

8

(Tr. 419-25).

On November 30, 2006, Claimant was attended by Dr. Doug Nolan, complaining of intermittent pain in his right wrist if he strained it and occasional problems holding objects in his right hand. Dr. Nolan noted Claimant had a restriction in the extension of his right hand. (Tr. 459-60). Later, on April 18, 2007, Dr. Nolan offered the opinion that Claimant was capable of performing medium work with limiting factors of decreased right wrist and hand strength, right wrist and left elbow discomfort, and abdominal muscle fatigue. (Tr. 455).

On August 13, 2007, Dr. Nolan treated Claimant for intermittent right wrist and left elbow pain. He treated Claimant with Votaren. (Tr. 453-54).

On September 17, 2007, Claimant was evaluated by Dr. Brian Chalkin, an orthopedist. Claimant complained of right wrist and left elbow pain. He informed Dr. Chalkin that he suffered some numbness, tingling, sensation changes, and grip weakness in his right hand. His range of motion of his left elbow caused him some pain. Dr. Chalkin found Claimant to have 40 degrees of extension and 45 degrees of flexion in his right wrist. Claimant had some minimal tenderness to palpation over the hardware in his left elbow. Claimant had regained most of his left elbow range of

motion with only 5 degree flexion contracture. X-rays revealed Claimant's distal radius in his right wrist was "excessively shortened in relation to the ulnar variance." Dr. Chalkin indicated Claimant's right wrist fracture appeared to be healed with a slightly displaced distal radius with a volar plate maintaining the alignment of the radius but with a loss of volar tilt. Dr. Chalkin diagnosed Claimant with right distal radius malunion with pain likely related to this malunion and his ulnar positive variance abnormality, right wrist pain related to the deep orthopedic hardware, right carpal tunnel syndrome, and left elv9ow pain related to orthopedic hardware. (Tr. 492-93).

On October 24, 2007, an EMG was performed by Dr. Goldman. The testing revealed entrapment syndrome of Claimant's right median nerve at the wrist compatible with carpal tunnel syndrome. (Tr. 504).

On November 2, 2007, Claimant was evaluated by Dr. Jean Bernard. Claimant complained of right upper extremity pain and problems with numbness and tingling in his right hand. EMG testing revealed Claimant suffered severe "right-sided carpal tunnel syndrome with motor axonal loss." (Tr. 496-99).

On December 17, 2007, Claimant was evaluated again by Dr. Chalkin. After reviewing Claimant's EMG and nerve conduction

study, Dr. Chalkin recommended Claimant undergo a mini open carpal tunnel release surgery since he continued to suffer numbness and pain in his right wrist. Dr. Chalkin noted Claimant's severe restriction in motion of the wrist with extension and flexion of 40 degrees. Claimant had ulnar-sided wrist pain and an extremely prominent ulnar head. Claimant's wrist plate had one peg that was close to his joint and he had "severe ulnar positive variance proximally with approximately 4 mm of ulnar length." Dr. Chalkin recommended removal of the hardware from Claimant's right distal radius with an open carpal tunnel release and an ulnar shortening osteotomy. Dr. Chalkin believed shortening Claimant's wrist would decrease his pain. Dr. Chalkin planned to remove some bone from the ulnar side of Claimant's wrist to relieve pressure from that side of the wrist. (Tr. 550).

On April 3, 2008, Claimant was evaluated by Dr. Ronald Schatzman. Dr. Schatzman found Claimant had limitation of pronation of the right wrist to 70 degrees and palmar wrist hinge of 35 degrees. Flexion and dorsal flexion was limited to 30 degrees. Ulnar deviation on the right wrist was limited to 10 degrees and radial deviation was 20 degrees. Dr. Schatzman found normal range of motion of the left elbow. (Tr. 515, 517).

On November 24, 2008, Claimant again saw Dr. Chalkin. Dr.

Chalkin recommended an open carpal tunnel release with removal of the hardware as Claimant was experiencing pain. (Tr. 589).

The ALJ determined Claimant suffered from the severe impairments of status post injury to the right wrist and left elbow, carpal tunnel syndrome, and diabetes mellitus. (Tr. 22). He then found Claimant had the RFC to perform sedentary work except that he was unable to complete an 8 hour workday, 5 days per week for the closed period from November 23, 2005 through August 13, 2007. He also found that there were no jobs that existed in significant numbers in the national economy that Claimant could perform because of his limitations during this period. (Tr. 23-24).

After August 14, 2007, however, the ALJ found medical improvement occurred in Claimant's condition. The ALJ's evidence of medical improvement is summarized in the decision as follows:

> The claimant was seen by Indian Health Services on April 18, 2007. The claimant stated that he had been working at the flea market. The doctor opined that the claimant is able to work. The claimant presented again on August 13, 2007. He stated that "pain pops up every now and then for a little while." No x-ray was performed on this date as the claimant has no history that would require additional x-rays given that physical exam was unremarkable. The claimant stated that he was currently attempting to receive disability from his past injuries and he thought he may need an x-ray as he was occasional pain "like a shot that can cause him to need to switch a pop can from one hand to the other." The claimant was

advised that the doctor believed the claimant would have occasional pain and that it would not prevent him from working. He was currently taking no pain meds for this.

(Tr. 25).

"Medical improvement" under the Social Security regulations represents

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s).

20 C.F.R. §§ 404.1594(b)(1) and 416.994(b)(1).

The "medical improvement" standard applies not only in cases involving an attempt to cease benefits but also in cases involving a closed period of disability such was found in this case. Shepherd v. Apfel, 184 F.3d 1196, 1200 (10th Cir. 1999). The sequential application of the medical improvement standard was explained by the Tenth Circuit in Shepherd in the following manner:

> To apply the medical improvement test, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) which was present at the time of the most recent favorable medical decision finding the claimant disabled. See [20 C.F.R.] § 404.1594(b)(7). Then, in order to determine that medical improvement is related to ability to work, the ALJ must reassess a claimant's residual functional capacity (RFC) based on the current severity of the impairment(s) which was present at claimant's last favorable medical

13

> decision. See [20 C.F.R.] § 404.1594(c)(2). The ALJ
> must then compare the new RFC with the RFC before the
> putative medical improvements. The ALJ may find medical
> improvement related to an ability to do work only if an
> increase in the current RFC is based on objective medical
> evidence. See id.

Id. at 1201.

The ALJ concluded that after August 14, 2007, Claimant was able to perform his past relevant work as a flagger and shopping cart assembler. (Tr. 29). While the ALJ considered some of the medical opinions in the reformulated RFC, he ignored others. For instance, Dr. Chalkin found healing problems with the distal radius and malunion of the area. (Tr. 492-93). It is undisputed Claimant suffers pain from carpal tunnel syndrome in the right wrist. The ALJ's utter rejection of the condition in the reformulated RFC because Claimant had not had treatment for a year is not supported. Dr. Chalkin maintains the condition is limiting and painful and the release surgery and removal of the hardware was still needed. The ALJ should consider the totality of the medical record on remand, including the areas of limitation and pain found by Dr. Chalkin. It may ultimately be the case that the release surgery will demonstrate medical improvement. Until all of the medical records and opinions are considered, however, the decision of the ALJ is not supported by substantial evidence. This Court will not entertain Claimant's suggestion that benefits be awarded directly

14

since the ALJ should be given an opportunity to reexamine his decision and the entirety of the medical record.

Claimant's alternative arguments need not be considered at this time since the issue of medical improvement should be examined in light of the entire medical record. However, the ALJ is urged to reexamine his consideration of Dr. Grooms' opinion as well as the limitations imposed in the second RFC and whether his decision adequately considered Claimant's limitations in handling on remand.

## Conclusion

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, this Court finds, in accordance with the fourth sentence of 42 U.S.C. § 405(g), the ruling of the Commissioner of Social Security Administration should be and is **REVERSED and the matter REMANDED** for further proceedings consistent with this Opinion and Order.

DATED this 29th day of March, 2011.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE